# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PETER VIGUE,

     Plaintiff,

v.                                  Case No. 3:19-cv-186-J-32JBT

DAVID B. SHOAR, in his official
capacity as Sheriff of St. Johns
County,

     Defendant.

_____

# O R D E R

Peter Vigue is a homeless resident of St. Johns County who stands on public roadways and holds signs to solicit charitable donations from passersby. Mr. Vigue's signs often bear messages like "God Bless, Be Safe" or "Please Care." In busy areas of town, Mr. Vigue may see up to ten thousand people per day.

Two Florida laws, FLA. STAT. §§ 316.2045 and 337.406 (2019), prohibit individuals from soliciting charity on roadways in Florida without a permit issued by a local government. Sections 316.2045(2)–(4) contain exceptions to the permitting requirement for Internal Revenue Code § 501(c)(3) registered organizations and for political campaigning. Mr. Vigue claims that St. Johns County Sheriff David B. Shoar enforces §§ 316.2045 and 337.406 against

homeless individuals to forbid them from soliciting charitable donations in public spaces, including sidewalks and roadways. In this 42 U.S.C. § 1983 action, he contends these statutes are facially unconstitutional.

This case is before the Court on cross-motions for summary judgment. (Docs. 59, 60). The Court held oral argument on June 2, 2020, the record of which is incorporated by reference. (Doc. 75).

### I.    FACTS AND PROCEDURAL HISTORY

#### A.    Preliminary Injunction

On May 6, 2019, the Court entered a preliminary injunction enjoining both Sheriff Shoar and Gene Spaulding, in his official capacity as Director of the Florida Highway Patrol ("FHP"), from enforcing § 316.2045 against Mr. Vigue during the pendency of this case. (Doc. 32). In so doing, the Court relied on the decisions of two other district courts in the Eleventh Circuit that found § 316.2045 unconstitutional and issued preliminary and permanent injunctions, as well as on the Florida Attorney General's opinion that subsequent amendments have not cured the statute's constitutional infirmities. Id. at 3–5. The Court declined, however, to extend the preliminary injunction to § 337.406 because at that time, Mr. Vigue had "not sufficiently shown he ha[d] standing to obtain an injunction against enforcement of a statute under which he ha[d] not been cited." Id. at 3 n.1. The Court limited injunctive relief to Mr. Vigue only. Id. at 7.

2

On August 16, 2019, in response to the preliminary injunction (Doc. 32), Sheriff Shoar enacted Policy 41.39 for the St. Johns County Sheriff's Office ("SJSO") which states that officers are not to enforce § 316.2045(2)–(4), are to limit enforcement of §§ 316.2045(1) and 337.406, and are to receive training regarding the policy change.[1] (Doc. 59-16). The policy is a response to litigation and may be changed depending on the outcome of this case. (Docs. 59-16; 59-8 at 17:1–16, 59:1–19, 61:19–20). Additionally, Sheriff's deputies were told not to arrest, cite, or stop Mr. Vigue for violations of either statute unless he was committing other crimes. (Docs. 59-8 at 81–98; 59-10 at 21:24–22:19; 59-5 at 33:8–15; 59-4 at 28:11–25; 59-6 at 43:6–15; 59-11 at 36:19–25).

---

[1] Regarding enforcement of §§ 316.2045(1) and 337.406, Policy 41.39 provides:

> So long as a person does not impede the free, convenient, and normal use of the road, SJSO will not treat entering or leaving a roadway while traffic is stopped pursuant to a traffic light as a violation of Section 316.2045(1). SJSO will not use this provision to prohibit persons from engaging in lawful conduct, such as charitable solicitation adjacent to public streets, highways, or roads, so long as any incursion is during stopped traffic pursuant to a traffic light and does not impede the free, convenient, and normal use of the road. Additionally, SJSO will not enforce this provision against a person who has left the roadway by the time traffic is permitted to move, so long as the person does not impede the free, convenient, and normal use of the road.

(Doc. 59-16 at 2–3).

### B.   Florida Highway Patrol Settlement

Mr. Vigue originally brought this lawsuit against both Sheriff Shoar and FHP. (See Doc. 1). The Office of the Florida Attorney General represented FHP. (Doc. 15). The Court anticipated that the Attorney General, charged with defending Florida laws, would provide a comprehensive argument regarding the constitutionality of §§ 316.2045 and 337.406, and that Sheriff Shoar would be important, though not primary, to that discussion.

However, on October 28, 2019, FHP settled with Mr. Vigue. (Docs. 45, 45-1). Almost identical to the language of Sheriff Shoar's Policy 41.39, FHP agreed to prohibit enforcement of § 316.2045(2)–(4), limit its enforcement of § 316.2045(1) and § 337.406, provide FHP officers with related training, and circulate a bulletin regarding its new enforcement scheme.[2] (Doc. 45-1). The

_____

[2] FHP agreed to limit its enforcement of § 316.2045(1) and 337.406 as follows:

> So long as a person does not impede the free, convenient, and normal use of the road, FHP will no longer treat entering or leaving a roadway while traffic is stopped pursuant to a traffic control device as a violation of Section 316.2045(1) [or of Section 337.406]. And FHP will no longer use th[ese] provision[s] to prohibit persons from engaging in lawful conduct such as charitable solicitation adjacent to public streets, highways, or roads, so long as any incursion is during stopped traffic pursuant to a control device and does not impede free, convenient, and normal use of the road. Additionally, FHP will not enforce th[ese] provision[s] against a person who has left the roadway by the time traffic is permitted to move and does not impede the free, convenient, and normal use of the road.

4

Florida Department of Highway Safety and Motor Vehicles, of which FHP is one component, agreed to remove § 316.2045(2)–(4) from the Uniform Traffic Citations, communicate its enforcement policy to various law enforcement entities, include edited versions of the statutes at issue in its annual package of requested legislation, and provide Mr. Vigue's counsel with a report of arrests and citations under the statutes. Id. The agreeement also stated that Mr. Vigue would continue litigation against Sheriff Shoar, seeking an order to permanently enjoin enforcement of §§ 316.2045 and 337.406, and that the Florida Attorney General retained authority to intervene to defend the statutes, though she has not done so.[3] Id. Thus, FHP has agreed not to enforce the statutes at issue and is no longer a party to this lawsuit, while Sheriff Shoar has decided to continue to defend the case. The Court proceeds in that context.

## C.   Enforcement of §§ 316.2045 and 337.406 Prior to Preliminary Injunction

Before this lawsuit, Sheriff Shoar had not issued formal written guidance, policies, or directives regarding how to enforce §§ 316.2045 or 337.406. (Doc. 59-8 at 48:13–20, 50:8–20). From 2016 to 2019, deputies used their own discretion

_____

(Doc. 45-1 at 11).

[3] The settlement agreement included various other deadlines, directives, and provisions, including a payment to Vigue for the costs, attorneys' fees, and expenses incurred in litigation. (Doc. 45-1 at 4).

to issue citations and warnings to Mr. Vigue under §§ 316.2045 and 337.406. (Docs. 59-5 at 10:8–11:3; 59-9 at 20:24–21:6; 59-6 at 49:11–16; 59-10 at 20:23–21:14). Between January 17, 2017 and July 29, 2019, the SJSO states that it received fifty-four calls for assistance related to Vigue standing in roadways. (Doc. 66 at 3). Mr. Vigue, for his part, says that he has felt harassed by Sheriff's deputies and does not try to cause any traffic issues when he holds his sign requesting charitable donations.[4] (Doc. 60-9). The Court enumerates the relevant warnings, citations, and arrests that Mr. Vigue has received under each of the statutes below.

> i.   Mr. Vigue has been cited under § 316.2045.

Section 316.2045(1) prohibits obstructing the use of public streets, highways, and roads. Violations of § 316.2045(1) may result in noncriminal traffic citations. § 316.2045(1). Section 316.2045(1) states:

> It is unlawful for any person or persons willfully to obstruct the free, convenient, and normal use of any public street, highway, or road by impeding, hindering, stifling, retarding, or restraining traffic or passage thereon, by standing or approaching motor vehicles thereon, or by endangering the safe movement of vehicles or pedestrians traveling thereon; and any person or persons who violate the provisions of this subsection, upon conviction, shall be

---

[4] Mr. Vigue has stated that he feels he has been harassed for holding his sign. (Doc. 60-9 at 142:9–13). "I'm not out to bother people or hurt people on any—whether you're in a car, vehicle, on foot or you have a business, I'm not out there to bother you or hurt you. I just want to see people smile. Put a smile on your face, and I'll go on my way. If you give me something, that's good. If you don't, that's fine." (Doc. 60-9 at 147:14–20).

cited for a pedestrian violation, punishable as provided in chapter 318.

§ 316.2045(1).

Sheriff's deputies have issued warnings or citations to Mr. Vigue under § 316.2045(1) six times:

- June 28, 2016 – Guilty, paid fine on December 21, 2016. (Docs. 2-7 at 2–3; 60-1).

- October 2, 2018 – Dismissed on December 27, 2018. (Docs. 2-7 at 14–15; 60-4).

- October 28, 2018 – Issued written traffic warning. (Doc. 59-2 at 1).

- January 8, 2019 – Dismissed on January 10, 2019. (Doc. 2-7 at 23–24).

- March 7, 2019 – Dismissed on May 17, 2019. (Doc. 23 at 6; 59-1 at 1).

- March 11, 2019 – Dismissed on May 9, 2019. (Doc. 23 at 7; 59-1 at 1).

Violations of § 316.2045(2) are more serious and may result in second-degree misdemeanor charges. Like § 316.2045(1), § 316.2045(2) prohibits obstructing the use of public streets, highways, and roads, but § 316.2045(2) specifically disallows individuals from obstructing roads to solicit when they have no permit. Section 316.2045(2) grants an exception to the permit requirement for 501(c)(3) organizations and their representatives on streets and roads not maintained by the state, and the statute cross-references the other

law that Mr. Vigue claims is unconstitutional, § 337.406. Section 316.2045(2)

provides that:

> It is unlawful, without proper authorization or a lawful permit, for any person or persons willfully to obstruct the free, convenient, and normal use of any public street, highway, or road by any of the means specified in subsection (1) in order to solicit. Any person who violates the provisions of this subsection is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. Organizations qualified under s. 501(c)(3) of the Internal Revenue Code and registered pursuant to chapter 496, or persons or organizations acting on their behalf are exempted from the provisions of this subsection for activities on streets or roads not maintained by the state. Permits for the use of any portion of a state-maintained road or right-of-way shall be required only for those purposes and in the manner set out in s. 337.406.

§ 316.2045(2).

Sheriff's deputies have cited or arrested Mr. Vigue under § 316.2045(2)

seven times:

- April 18, 2017 – Nolle prossed on June 2, 2017. (Docs. 2-7 at 4–5; 60-2; 59-1 at 1).

- November 25, 2017 – No information on disposition. (Docs. 2-7 at 11–13; 60-3; 59-1 at 1).

- November 13, 2018 – Arrested and booked into St. Johns County Jail; nolle prossed on December 2, 2018. (Docs. 2-7 at 16–22; 60-5; 59-1 at 1).

- January 8, 2019 – Arrested and booked into St. Johns County Jail; nolle prossed on January 15, 2019. (Docs. 2-7 at 25–31; 60-7; 59-1 at 1).

- January 13, 2019 – Arrested and booked into St. Johns County Jail; nolle prossed on February 11, 2019.[5] (Doc. 2-7 at 32–36; 59-1 at 1).

- February 13, 2019 – Nolle prossed on April 26, 2019. (Doc. 23 at 3; 59-1 at 9).

- February 22, 2019 – Nolle prossed on March 12, 2019. (Doc. 23 at 4–5; 59-1 at 1).

Section 316.2045(3) elaborates on the conditions under which 501(c)(3) organizations may be exempt from the requirement to obtain a permit from a local government for the use of streets, roads, or rights-of-way not maintained by the state.[6] Finally, § 316.2045(4) clarifies that no part of the law "shall be

---

[5] The Offense Report from January 13, 2019, includes the following Probable Cause Narrative, alluding to Mr. Vigue's other offenses:

I observed the defendant standing at State Road 312 and Tingle Court holding a sign and approaching vehicles with their windows down. The defendant does not have a permit to solicit on a state road. I knew the defendant to have been issued a citation for Soliciting without a permit on October 2, 2018. The defendant was also placed under arrest for the same offense on November 13, 2018 and January 8, 2019.

(Doc. 59-1 at 3–4).

[6] The full text of § 316.2045(3) reads:

Permits for the use of any street, road, or right-of-way not maintained by the state may be issued by the appropriate local government. An organization that is qualified under s. 501(c)(3) of the Internal Revenue Code and registered under chapter 496, or a person or organization acting on behalf of that organization, is exempt from local requirements for a permit issued under this subsection for charitable solicitation activities on or along streets

or roads that are not maintained by the state under the following conditions:

(a) The organization, or the person or organization acting on behalf of the organization, must provide all of the following to the local government:

    1. No fewer than 14 calendar days prior to the proposed solicitation, the name and address of the person or organization that will perform the solicitation and the name and address of the organization that will receive funds from the solicitation.

    2. For review and comment, a plan for the safety of all persons participating in the solicitation, as well as the motoring public, at the locations where the solicitation will take place.

    3. Specific details of the location or locations of the proposed solicitation and the hours during which the solicitation activities will occur.

    4. Proof of commercial general liability insurance against claims for bodily injury and property damage occurring on streets, roads, or rights-of-way or arising from the solicitor's activities or use of the streets, roads, or rights-of-way by the solicitor or the solicitor's agents, contractors, or employees. The insurance shall have a limit of not less than $1 million per occurrence for the general aggregate. The certificate of insurance shall name the local government as an additional insured and shall be filed with the local government no later than 72 hours before the date of the solicitation.

    5. Proof of registration with the Department of Agriculture and Consumer Services pursuant to s. 496.405 or proof that the soliciting organization is exempt from the registration requirement.

(b) Organizations or persons meeting the requirements of subparagraphs (a)1.-5. may solicit for a period not to exceed 10 cumulative days within 1 calendar year.

(c) All solicitation shall occur during daylight hours only.

(d) Solicitation activities shall not interfere with the safe and efficient movement of traffic and shall not cause danger to the participants or the public.

(e) No person engaging in solicitation activities shall persist after solicitation has been denied, act in a demanding or harassing manner, or use any sound or voice-amplifying apparatus or device.

construed to inhibit political campaigning on the public right-of-way or to require a permit for such activity." Thus, representatives of political campaigns may also lawfully solicit donations without a permit.

ii.    Mr. Vigue has been warned under § 337.406 and other statutes.

Violation of § 337.406 is a second-degree misdemeanor offense. § 337.406(5). Like § 316.2045, § 337.406(1) prohibits solicitation without a permit, but it applies to rights-of-way of state transportation facilities and lists various prohibited uses of those rights-of-way in addition to solicitation. Section 337.406(1) provides:

> Except when leased as provided in s. 337.25(5) or otherwise authorized by the rules of the department, it is unlawful to make any use of the right-of-way of any state transportation facility, including appendages thereto, outside of an incorporated municipality in any manner that interferes with the safe and efficient movement of people and property from place to place on the transportation facility. Failure to prohibit the use of right-of-way in this manner will endanger the health, safety, and general welfare of the public by causing distractions to motorists, unsafe pedestrian movement within travel lanes, sudden stoppage or slowdown of traffic, rapid lane changing and other dangerous traffic movement, increased vehicular accidents, and motorist injuries and fatalities. Such prohibited uses include, but are not limited to, the free distribution or sale, or display or solicitation for

---

(f) All persons participating in the solicitation shall be at least 18 years of age and shall possess picture identification.
(g) Signage providing notice of the solicitation shall be posted at least 500 feet before the site of the solicitation.
(h) The local government may stop solicitation activities if any conditions or requirements of this subsection are not met.

§ 316.2045(3).

11

free distribution or sale, of any merchandise, goods, property or services; the solicitation for charitable purposes; the servicing or repairing of any vehicle, except the rendering of emergency service; the storage of vehicles being serviced or repaired on abutting property or elsewhere; and the display of advertising of any sort, except that any portion of a state transportation facility may be used for an art festival, parade, fair, or other special event if permitted by the appropriate local governmental entity. Local government entities may issue permits of limited duration for the temporary use of the right-of-way of a state transportation facility for any of these prohibited uses if it is determined that the use will not interfere with the safe and efficient movement of traffic and the use will cause no danger to the public. The permitting authority granted in this subsection shall be exercised by the municipality within incorporated municipalities and by the county outside an incorporated municipality. Before a road on the State Highway System may be temporarily closed for a special event, the local governmental entity which permits the special event to take place must determine that the temporary closure of the road is necessary and must obtain the prior written approval for the temporary road closure from the department. Nothing in this subsection shall be construed to authorize such activities on any limited access highway. Local governmental entities may, within their respective jurisdictions, initiate enforcement action by the appropriate code enforcement authority or law enforcement authority for a violation of this section.

Sheriff's deputies have warned Mr. Vigue twice under § 337.406:

- December 7, 2015 – Written traffic warning. (Doc. 59-2 at 5).

- December 31, 2017 – Verbal warning.[7] (Doc. 59-2 at 9).

---

[7] A Sheriff's deputy described his encounter with Mr. Vigue on December 31, 2017 in a Field Interview Narrative:

Peter was standing with a cardboard sign just outside Cobblestone property in the grass between the sidewalk and curb of Old Moultrie Rd. I observed Peter enter the roadway of Jenkins St just outside the CBL property line to receive money from a motorist exiting the plaza.

Mr. Vigue has not been cited or arrested under § 337.406. (See Doc. 59-2).

Deputies' reports reflect that Mr. Vigue received verbal warnings in three other instances:

- August 11, 2015 – Verbal warning for violation of unspecified statutes. (Doc. 59-2 at 3).

- December 7, 2016 – Verbal warning for violation of unspecified statutes. (Doc. 59-2 at 7).

- April 1, 2019 — Verbal warning for soliciting charitable donations in an intersection.[8]  (Doc. 59-2 at 13).

---

> I made Peter distinctly aware where he was standing was within the right-of-way of Old Moultrie Rd and he was (1) using the right-of-way to solicit for charitable purposes and (2) entered the roadway, interfering with the safe movement of vehicles, contrary to FS 337.406.
>
> Peter acknowledged he understands where the CBL property line is at the Old Moultrie Rd entrance and now thoroughly understands where the right-of-way is. He was informed this warning would be documented and appropriate law enforcement action would follow if he is located, committing the same offense.
>
> At the time, he was wearing a grey vest with long-sleeve orange shirt under it, jeans, and green gloves. His sign read, "God Bless, Be Safe."

(Doc. 59-2 at 9).

[8] A Sheriff's deputy's "Suspicious Person" report from April 1, 2019 includes the following narrative:

> Peter Vigue was standing in the intersection holding a hand written sign, which read "God Bless." Once Peter saw my patrol vehicle, he walked away from the intersection, leaving another hand written sign and plastic bottle on the ground. I advised Peter

13

Following the Court's preliminary injunction (Doc. 32), pending prosecutions against Mr. Vigue were dismissed. (Docs. 59-1). All but one of the prosecutions against Mr. Vigue under § 316.2045 were dismissed or nolle prossed, and Mr. Vigue was never found guilty of the other charges. (Docs. 59-1, 2–7, 23).

## D.    History of Florida Non-Solicitation Statutes

This Court is not the first to address the constitutionality of §§ 316.2045 or 337.406. In this District in 2003, the Honorable John Antoon II issued a permanent injunction against enforcement of § 316.2045, declaring the statute facially unconstitutional. Bischoff v. Florida, 242 F. Supp. 2d 1226 (M.D. Fla. 2003). In 2006, the Honorable Stephan P. Mickle in the Northern District of Florida issued a preliminary injunction as to both statutes at issue here. Chase v. City of Gainesville, No. 1:06-CV-044-SPM/AK, 2006 WL 2620260 (N.D. Fla. Sept. 11, 2006). Subsequently, the parties in Chase agreed to have the court permanently enjoin enforcement of §§ 316.2045 and 337.406 and find both statutes facially unconstitutional. Chase v. City of Gainesville, No. 1:06-CV-44-SPM/AK, 2006 WL 3826983 (N.D. Fla. Dec. 28, 2006).

---

to collect his items or he would be ticketed. Peter said he wasn't leaving the area and he wasn't breaking the law. Advised him to stay out of the roadway or he would be subject to arrest. Peter assured me he would not walk or stand in the road way.

(Doc. 59-2 at 13).

In 2007, the Florida Legislature amended § 316.2045(3) to exempt certain 501(c)(3) organizations from the permit requirements for charitable solicitation and to establish conditions with which the organizations must comply to take advantage of that exemption. Fla. Att'y Gen. Op. 2007-50 (2007). On November 7, 2007, Florida Attorney General Bill McCollum issued an opinion that the amendments did not address the constitutional infirmities identified in <u>Bischoff</u> and recommended that the Florida Legislature address those issues. <u>Id.</u>[9] To date, the Legislature has not done so.

Both §§ 316.2045 and 337.406 reference a permitting scheme. However, there is not (and never has been) a permit process established in St. Johns County, St. Augustine, or the state of Florida for Mr. Vigue or other individuals wishing to engage in charitable solicitation on public streets, highways, or roads. (Doc. 59-3 at 1–3). Thus, Mr. Vigue does not have such a permit, and Sheriff Shoar does not point to any avenue through which he may obtain one to solicit donations lawfully. <u>Id.</u> Mr. Vigue is not alone in soliciting charity on St. Johns County roadways, and authorities have questioned other individuals

---

[9] "To read the amended statutory language to allow only charities and political campaigners to solicit could, arguably, subject the statute to federal constitutional challenge as violating First Amendment free speech rights and Fourteenth Amendment equal protection rights . . . . I would strongly suggest that the Florida Legislature revisit this statute to consider the First Amendment problems raised by the <u>Bischoff</u> case." Fla. Att'y Gen. Op. 2007-50 (2007).

about whether they possessed appropriate permits. (Docs. 59-9 at 27:14–28:2, 59-10 at 15:15–25, 59-4 at 35:24–36:15, 59-14 at 18:17–19:1). Authorities have enforced §§ 316.2045 and 337.406 against others through citations, arrests, and warnings. (Docs. 2-4, 59-15, 59-11 at 13:14–14:8, 59-4 at 36:2–15, 59-10 at 19:12–14).

### E.  Procedural Posture

The parties filed cross-motions for summary judgment (Docs. 59, 60), and the Court received responses to both motions (Docs. 65, 66). There are no disputed issues of material fact.[10] Though Mr. Vigue asserts that the statutes are unconstitutional facially and as-applied, he confirmed through counsel at the hearing that he now asks for a ruling only as to the facial challenge. (Doc. 75 at 50). Mr. Vigue requests that the Court enter a declaratory judgment that both statutes are facially unconstitutional in violation of the First and Fourteenth Amendments; that the Court enter a permanent injunction prohibiting Sheriff Shoar from enforcing both statutes; and that the Court enter judgment in favor of Mr. Vigue, finding Sheriff Shoar liable for damages for past enforcement of the statutes against Mr. Vigue, in an amount to be determined at trial. (Doc. 59 at 4). Sheriff Shoar claims that the evidence "does not support

---

[10] "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T-Mobile S. LLC v. City of Jacksonville, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

the existence of the alleged official policy, practice and/or custom of the Sheriff." (Doc. 60 at 2). He also maintains that Mr. Vigue's challenge to § 337.406 should be denied for lack of standing and asks that the permanent injunction be denied in its entirety. Id.

## II.   DISCUSSION

Section 1983 establishes a cause of action against state officials who violate constitutional rights while acting under color of state law. 42 U.S.C. § 1983 (2018). Mr. Vigue mounts a facial challenge as to both statutes at issue. (Docs. 59, 75). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). In contrast to an as-applied challenge, a facial challenge "seeks to invalidate a statute or regulation itself." United States v. Frandsen, 212 F.3d 1231, 1235 (11th Cir. 2000). Here, Mr. Vigue challenges the constitutionality of §§ 316.2045 and 337.406 as content-based, overbroad, vague prior restraints on speech, and adds that § 316.2045 unconstitutionally favors 501(c)(3) organizations and campaign speech. (Doc. 59).

### A.   Standing to Challenge §§ 316.2045 and 337.406

For constitutional standing to challenge the statutes, Mr. Vigue must show (1) that he suffered an injury in fact, or invasion of a legally protected

17

interest, that is concrete and particularized as well as actual and imminent; (2) that there is a causal connection between that injury and the alleged conduct, traceable to the action of the Defendant; and (3) that it is likely and not merely speculative that the injury will be redressed by a favorable decision in this case. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). When a lawsuit challenges the legality of government action or inaction:

> [T]he nature and extent of facts that must be averred (at the summary judgment stage) . . . in order to establish standing depends considerably upon whether the Plaintiff is himself an object of the action (or foregone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

Id. at 561–62.

Soliciting charity is constitutionally protected expression. See Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980) ("[C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment."); Smith v. City of Fort Lauderdale, 177 F.3d 954, 956 (11th Cir. 1999) ("Like other charitable solicitation, begging is speech entitled to First Amendment protection."). Mr. Vigue gained a legally cognizable interest in challenging § 316.2045 when St. Johns County law enforcement took concrete action against him with a combined twelve arrests

and citations under § 316.2045. (Docs. 2-7, 23, 59-1). Those citations demonstrate that Mr. Vigue was the object of government action under the statute. There is "little question" that action under the statute caused him injury, and a judgment permanently preventing the enforcement of § 316.2045 would directly redress that injury. Thus, Mr. Vigue has standing to bring this § 1983 action challenging § 316.2045.

Mr. Vigue also has standing to challenge § 337.406 even though he has not been cited or arrested under the statute. Threats of arrest for engaging in free speech activities are evidence of "an actual and concrete injury wholly adequate to satisfy the injury in fact requirement of standing." Bischoff v. Osceola Cty., 222 F.3d 874, 884 (11th Cir. 2000). When there is a credible threat of prosecution, a plaintiff is not required to expose himself to actual arrest and prosecution to have standing to challenge statutory provisions. Steffel v. Thompson, 415 U.S. 452, 459 (1974) (finding that plaintiff had standing to challenge constitutionality of trespass statute after he was warned twice to stop handbilling and told he would be arrested if he repeated such conduct); see also Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998) ("[S]tanding exists at the summary judgment stage when the plaintiff has submitted evidence indicating an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." (internal quotation omitted)).

19

Bischoff sheds light on this issue. The case went to the Eleventh Circuit in 2000 on the issue of standing prior to the ultimate ruling from Judge Antoon in 2003. Plaintiffs Bischoff and Stites were not actually arrested during the relevant demonstration, but other protesters were arrested. Bischoff, 222 F.3d at 877. The Eleventh Circuit reasoned that the threat of arrest under the challenged statutes was adequate to show injury in fact to establish standing. Id. at 884. Thus, Bischoff and Stites were ultimately found to have standing when "[b]oth Plaintiffs testified that they were threatened with arrest for engaging in the same handbilling conduct that resulted in the arrest and charge under the challenged statutes of [other protesters]." 222 F.3d at 885.

Similarly, Mr. Vigue received one written traffic warning in 2015 and one verbal warning in 2017 under § 337.406 but was never arrested or cited under the statute. (Doc. 59-2). On December 31, 2017, when Mr. Vigue was threatened with arrest under § 337.406, an officer informed Mr. Vigue that he was "acting contrary to FS 337.406" and "would be documented and appropriate law enforcement action would follow" if Mr. Vigue violated the statute again. (Doc. 59-2 at 9). Mr. Vigue ultimately satisfies the requirement for standing and need not expose himself to further threats to challenge the constitutionality of § 337.406. As in Bischoff, "it is clear that a decision in [Mr. Vigue's] favor declaring [§ 337.406] unconstitutional, either on [its] face or as applied to [Mr.

Vigue], would redress the injury of being threatened with arrest for engaging in constitutionally protected activity." 222 F.3d at 885.

## B. Sheriff's Liability Under 42 U.S.C. § 1983 in his Official Capacity

Sheriff Shoar makes little effort to defend the facial constitutionality of the statutes. (Docs. 60; 75). Instead, his primary argument is that Mr. Vigue may not hold him liable under 42 U.S.C. § 1983 because he has not established a custom, policy, or practice of enforcing the statutes at issue. Id.

Local governments may be held liable under § 1983 only when a constitutional deprivation arises from a governmental policy or custom. Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 694 (1978). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality . . . . A custom is a practice that is so settled and permanent that it takes on the force of law." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694. The government's official policy or custom must be the "moving force" behind the constitutional violation. Id.; see

also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997) (stating that a municipality, through its deliberate conduct, must be the "moving force" behind an alleged injury for § 1983 liability).

In Cooper, the Eleventh Circuit answered the question of whether a police chief enforcing a state law may subject a municipality to liability under § 1983. Cooper, 403 F.3d at 1223. The Court determined that a police chief's decision to enforce a Florida statute constituted the adoption of a policy sufficient to trigger municipal liability under § 1983. Id. at 1221. Chief Dillon, like Sheriff Shoar, argued that enforcement of a state law could not subject him to liability. Id. The Eleventh Circuit disagreed, stating:

> Dillon was clothed with final policymaking authority for law enforcement matters in Key West and in this capacity he chose to enforce the statute against Cooper. While the unconstitutional statute authorized Dillon to act, it was his deliberate decision to enforce the statute that ultimately deprived Cooper of constitutional rights and therefore triggered municipal liability. Thus, Dillon's choice to enforce an unconstitutional statute against Cooper constituted a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy. Accordingly, we find that the City of Key West, through the actions of Dillon, adopted a policy that caused the deprivation of Cooper's constitutional rights which rendered the municipality liable under § 1983.

Id. at 1223 (internal citations and quotations omitted).

Cooper bears a striking resemblance to this case. Chief Dillon oversaw enforcement of the state statute on only one occasion and was held liable, while

Sheriff Shoar has overseen repeated instances of enforcing § 316.2045 and § 337.406 over a four-year period.[11] (Docs. 2-7, 23). Like Mr. Vigue, Cooper argued that the statute improperly abridged First Amendment freedom. <u>Cooper</u>, 403 F.3d at 1213. The Court ultimately found that the statute was "a content-based restriction that chill[ed] the exercise of fundamental First Amendment rights without a compelling justification for doing so and accordingly [was] unconstitutional." <u>Id.</u> at 1223.

The Court does not overlook that Sheriff Shoar's role derives from Art. VIII, § 1(d), FLA. CONST., a different constitutional provision than those regarding municipalities and city police. "Whether an official has final policymaking authority is a question of state law." <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1342 (11th Cir. 1994). Courts have consistently held that "police

---

[11] The Court acknowledges that in <u>Cooper</u>, Chief Dillon personally swore an affidavit and obtained a warrant for Cooper's arrest under the challenged statute. 403 F.3d at 1212. Here, Sheriff Shoar has not personally arrested or sworn an affidavit for the arrest of Mr. Vigue. Still, <u>Cooper</u>'s reasoning applies. The question in <u>Cooper</u> was "whether Dillon had final policymaking authority for the City of Key West in law enforcement matters and whether his decision to enforce FLA. STAT. ch. 112.533(4) against Cooper was an adoption of 'policy' sufficient to trigger 1983 liability." <u>Id.</u> at 1221. The Court concluded that enforcement of a state law by a police chief may subject a municipality to liability. <u>Id.</u> at 1223. That conclusion did not hinge on personal enforcement by the police chief himself. Moreover, "when an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." <u>Busby v. City of Orlando</u>, 931 F.2d 764, 776 (11th Cir. 1991) (internal quotation omitted). The record shows that SJSO repeatedly and deliberately decided to enforce the challenged statutes against Mr. Vigue.

chiefs in Florida have final policymaking authority in their respective municipalities for law enforcement matters" under state and local law. See, e.g., Cooper, 403 F.3d at 1222 (citing various statutes); Davis v. City of Apopka, 734 Fed. App'x 616, 619 (11th Cir. 2018) (citing to the Florida Constitution, local ordinances, and Cooper to determine that a city's police chief was a final policymaker); Rojas v. City of Ocala, 315 F. Supp. 3d 1256, 1288 (M.D. Fla. 2018) (analyzing the Florida Constitution, state law, and local ordinances to conclude that a police chief had authority that could subject a city to liability). Similarly, under the Florida Constitution, sheriffs are elected constitutional officers who can exercise final policymaking authority regarding law enforcement in their counties. Art. VIII, § 1(d), FLA. CONST. They have "absolute control over the selection and retention of deputies in order that law enforcement be centralized in the county, and in order that the people be able to place responsibility upon a particular officer for failure of law enforcement." Szell v. Lamar, 414 So.2d 276, 277 (Fla. 5th DCA 1982) (citing § 30.53, FLA. STAT. (1981)). Said another way, "[i]t is essential to law enforcement in the various counties of the State that the people shall be able to place responsibility upon a particular individual, the sheriff." Blackburn v. Brorein, 70 So. 2d 293, 298 (Fla. 1954).

"[C]ases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local

government in a particular area, or on a particular issue." <u>McMillian v. Monroe Cty.</u>, 520 U.S. 781, 785 (1997). Under Florida law, Sheriff Shoar is a final policymaker in St. Johns County for the enforcement of the two statutes at issue here. His position as a final policymaker for the St. Johns County is directly analogous to Chief Dillon's position as a final policymaker for Key West in <u>Cooper</u>.

Sheriff Shoar claims that a review of the relevant testimony reveals that "there was no promulgated policy to enforce these particular statutes."[12] (Doc. 66 at 8). However, local government liability attaches where a "deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 470 (1986). "[I]f a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy." <u>Vives v. City of New York</u>, 524 F.3d 346, 353 (2d Cir. 2008). The statutes being challenged here authorized Sheriff Shoar to act, but that is not the issue; the issue is

---

[12] Sheriff Shoar focuses on cases regarding deliberate indifference under the Eighth Amendment, exhaustion of administrative remedies, and excessive force violations to support his contention that he had no policy that would trigger municipal liability under § 1983. (Doc. 66 at 7–8). However, those cases are readily distinguishable.

whether Sheriff Shoar made a deliberate decision to enforce the statutes that ultimately deprived Mr. Vigue of his constitutional rights.

St. Johns County Sheriff's deputies arrested, cited, and warned Mr. Vigue from 2016 to 2019 under § 316.2045 and § 337.406 on at least fifteen occasions. (Docs. 2-7, 23). In doing so, they acted within SJSO unwritten policy from before this litigation. (Doc. 59-8 at 97: 4–13). Sheriff Shoar, as the final authority in SJSO, has the authority to decide whether to enforce a Florida statute as a matter of interpretation and enforcement discretion. Id. at 28:15–19. The record demonstrates that Sheriff Shoar made the deliberate decision (even following Bischoff, Chase, and the Attorney General's criticism of the 2007 amendment) to enforce the statutes. That the "on the street" decisions to warn, cite, and arrest Mr. Vigue were made by his deputies instead of the Sheriff himself does not matter. Quoting Cooper: "[Sheriff Shoar] was clothed with final policymaking authority for law enforcement matters in [St. Johns County] and in this capacity he chose to enforce the statute against [Mr. Vigue]." 403 F.3d at 1223.

At the hearing, Sheriff Shoar's counsel argued that it was not the Sheriff's role to justify the language of the statute because he did not draft or enact it. (Doc. 75 at 19:19–27:3). As a result, he claimed, Sheriff Shoar should be insulated from legal exposure. Id. But in the wake of Cooper, and with Sheriff

Shoar's deliberate decision to repeatedly enforce §§ 316.2045 and 337.406, Sheriff Shoar may be held liable under § 1983 in his official capacity.

### C.    The Constitutionality of § 316.2045

The Court's role in deciding whether a state law is constitutional is summarized well by Judge Antoon in <u>Bischoff</u>:

> Federal courts are courts of limited jurisdiction. The courts do not reach out to reform or rewrite state statutes that seem to require some improvement. Neither do the federal courts strike down valid laws of which they disapprove. It is the state legislature's duty to enact valid laws, and the Court's duty to declare what the law is, and how the law applies to the facts. The federal courts do not substitute laws they prefer for the will of the elected state legislature. But where parties in a controversy ask a federal court to declare whether a state law violates the Constitution of the United States, the Court must not shrink from its duty to adjudicate the question presented.

242 F. Supp. 2d at 1241. Here, the Court is asked to declare whether § 316.2045 violates the First and Fourteenth Amendments.[13]

Every court previously asked to evaluate § 316.2045 has declared the statute unconstitutional. Judge Antoon provided an in-depth analysis of § 316.2045 and concluded that the statute was unconstitutional for multiple reasons under First and Fourteenth Amendment jurisprudence. <u>Bischoff</u>, 242 F. Supp. 2d. 1226. In 2006, Judge Mickle adopted the logic and rationale of the <u>Bischoff</u> decision to grant a preliminary injunction enjoining enforcement of

---

[13]    The First Amendment is applicable to the states through the Fourteenth Amendment. <u>Elrod v. Burns</u>, 427 U.S. 347, 357 n.10 (1976).

§ 316.2045, which was later converted to a permanent injunction through settlement, finding that the statute violated the First and Fourteenth Amendments. <u>Chase</u>, 2006 WL 3826983, at *1–2. Finally, the Honorable William Terrell Hodges found a similar panhandling ordinance unconstitutional in <u>Booher v. Marion County</u>, No. 5:07-CV-00282WTHGRJ, 2007 WL 9684182 (M.D. Fla. Sept. 21, 2007).

The Court sees no reason to depart from the analysis of those courts. Accordingly, the Court limits discussion here to recent case law and the ineffectiveness of the 2007 amendments.

i.   <u>Section 316.2045 remains an unconstitutional content-based prohibition on speech in public fora.</u>

Content-based regulations of speech in public fora target speech based on its communicative content and "distinguish favored speech from disfavored speech on the basis of the ideas or viewpoints expressed." <u>Cooper</u>, 403 F.3d at 1215 (quoting <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 643 (1994)); <u>see also</u> <u>Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 115 (1991). Content-based regulations are subject to strict scrutiny. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." <u>Reed v. Town of Gilbert</u>, 576 U.S. 155, 163 (2015) (citations omitted).

In <u>Reed</u>, the Supreme Court clarified that "a speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter." <u>Id.</u> at 169 (finding town code to be content-based because the application of the code to public signs depended on the communicative content of the signs). Courts must:

> [C]onsider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

<u>Id.</u> at 163-64 (internal citation omitted).

Following <u>Reed</u>, multiple statutes that restrict charitable solicitation have been viewed as content-based and struck down because they cannot survive strict scrutiny. In this district, for example, the Honorable Steven D. Merryday permanently enjoined the City of Tampa from enforcing an ordinance that banned charitable solicitation in certain areas. <u>Homeless Helping Homeless, Inc. v. City of Tampa</u>, No. 8:15-CV-1219-T-23AAS, 2016 WL 4162882, at *5–6 (M.D. Fla. Aug. 5, 2016). Also applying <u>Reed</u>, the Seventh Circuit and a Massachusetts district court found that anti-panhandling statutes were content-based and violated free speech rights under the First Amendment. <u>Norton v. City of Springfield</u>, 806 F.3d 411 (7th Cir. 2015) (striking down statute as unconstitutional when it prohibited oral requests for

immediate payment of money but allowed signs requesting money and oral requests to send money later); <u>Thayer v. City of Worcester</u>, 576 U.S. 1048 (2015) (remanding case to district court for further consideration in light of <u>Reed</u>); <u>Thayer v. City of Worcester</u>, 144 F. Supp. 3d 218 (D. Mass. 2015) (concluding that statute prohibiting begging, panhandling, or soliciting in an aggressive manner was content-based, subject to strict scrutiny, and unconstitutional).

Even before <u>Reed</u>, the court in <u>Bischoff</u> found that § 316.2045 regulated speech on the basis of ideas expressed and was therefore content-based.

> Section 316.2045 selectively proscribes protected First Amendment activity—<u>i.e.</u>, it impermissibly prefers speech by § 501(c)(3) charities and by persons who are engaged in "political campaigning" over all other activity that retards traffic, without any showing that the latter is more disruptive than the former.
> Section 316.2045 makes the legality of conduct that retards traffic depend solely on the nature of the message being conveyed. Said differently, the Florida statute facially prefers the viewpoints expressed by registered charities and political campaigners by allowing ubiquitous and free dissemination of their views, but restricts discussion of all other issues and subjects. Section 316.2045 of the Florida Statutes, therefore, is presumptively invalid under the Equal Protection Clause and the First Amendment of the United States Constitution because it imposes content-based restrictions on speech in a traditional public forum.

242 F. Supp. 2d at 1256 (internal citations omitted). This analysis of § 316.2045 remains true for the current version of the statute. Most of the content-based restrictions that made the law facially unconstitutional in <u>Bischoff</u> remain in the current version of the law. In particular, § 316.2045(2) still exempts 501(c)(3) organizations, and persons or organizations acting on their behalf,

from the permitting requirements for streets or roads not maintained by the state, and it still, confusingly, conditions the need for permits on state-maintained roads or rights-of-way "only for those purposes and in the manner set out in s. 337.406." (More about § 337.406 later.)

The language of § 316.2045(4) is identical to the 2003 version of the statute when <u>Bischoff</u> was decided: "[n]othing in this section shall be construed to inhibit political campaigning on the public right-of-way or to require a permit for such activity." § 316.2045(4). The law impermissibly favors organizational, campaign, and other group speech over other types of speech, like individual charitable solicitation. Thus, § 316.2045 remains a presumptively invalid content-based regulation on protected speech. <u>See, e.g.</u>, <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid.").[14] The <u>Bischoff</u> court further concluded that § 316.2045 could not

_____

[14] The distinction between individuals and charitable or political groups may also be understood as the law favoring certain speakers. The Supreme Court in <u>Reed</u> commented on why speaker distinctions may be problematic under the First Amendment and are often subject to strict scrutiny:

In any case, the fact that a distinction is speaker based does not . . . automatically render the distinction content neutral. Because [s]peech restrictions based on the identity of the speaker are all too often simply a means to control content, we have insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference. Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based.

31

survive strict scrutiny, as is required of content-based regulations of speech in public fora, because it was not narrowly tailored to meet a compelling state interest. 242 F. Supp. 2d at 1236-37, 1256-59.

ii.    The Court adopts the reasoning of Bischoff.

Bischoff identified additional constitutional infirmities in § 316.2045, deeming the statute content-based and vague, insufficiently tailored to serve the compelling interest of safety, overbroad, and an unconstitutional prior restraint on speech. 242 F. Supp. 2d at 1250–59. At the preliminary injunction stage, the Court relied on Bischoff and Chase to support its finding that Mr. Vigue had a substantial likelihood of success on the merits of his claim that § 316.2045 is unconstitutional. (Doc. 32). There has been no material change to the statute since Bischoff. Reed only strengthens Bischoff's holding. Thus, the Court adopts the reasoning in Bischoff regarding § 316.2045. Florida Statute § 316.2045 is facially unconstitutional.

------

Likewise, a content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers. Characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry.

Reed, 576 U.S. at 170 (internal citations and quotations omitted). Section 316.2045 reflects the Legislature's preference for organizational and campaign speakers over individual speakers. This is yet another reason the law is subject to strict scrutiny.

### D.   The Constitutionality of § 337.406

Mr. Vigue contests the validity of § 337.406 on the grounds that it is unconstitutionally overbroad, vague, imposes an improper prior restraint on speech, and violates equal protection. (Doc. 59 at 19).

Section 337.406 has received some criticism in the courts, but it has not garnered as much attention as § 316.2045. The court in <u>Bischoff</u> commented that § 337.406 contained "opaque and undecipherable permit provisions," which have remained unchanged, but § 337.406 was not directly at issue in that case. 242 F. Supp. 2d at 1256.

In <u>News & Sun-Sentinel Co. v. Cox</u>, 702 F. Supp. 891 (S.D. Fla. 1988), a court in the Southern District of Florida found a prior version of § 337.406 unconstitutional. There, a newspaper publisher sued the City of Fort Lauderdale, the city commission, and the police chief for enforcing § 337.406, which prohibited the commercial use, including the sale of newspapers, of state-maintained roads. <u>Id.</u> at 893–94. The <u>Cox</u> court found that the prior version of § 337.406 was a content-neutral regulation of speech in public fora that was not narrowly tailored to serve a significant government interest and was therefore unconstitutional. <u>Id.</u> at 900–03. At that time, § 337.406 targeted commercial activity, whereas now, it prohibits using state rights-of-way of state transportation facilities "in any manner that interferes with the safe and efficient movement of people and property from place to place on the

transportation facility." § 337.406(1); see Sentinel Commc'ns Co. v. Watts, 936 F.2d 1189, 1191 n.1, 1195 n.6 (11th Cir. 1991).

In 2006, although the new version of § 337.406 was in use at the time, the Court in Chase found "no reason to depart from the thorough analys[is] undertaken" in Cox and granted a preliminary injunction, finding a substantial likelihood that § 337.406 was unconstitutional. Chase, 2006 WL 2620260, at *1. The Court analyzes the new version of the statute here.

i.   Section 337.406(1) imposes an unconstitutional prior restraint.

A prior restraint on speech exists "when the government can deny access to a public forum before the expression occurs." United States v. Frandsen, 212 F.3d 1231, 1236–37 (11th Cir. 2000). Prior restraints "are not per se unconstitutional," but there is a "strong presumption against their constitutionality." Id. at 1237. Attempts to subject the exercise of First Amendment freedoms to the prior restraint of a license are unconstitutional when they lack narrow, objective, and definite standards to guide the licensing authority. Shuttlesworth v. Birmingham, 394 U.S. 147, 150–51 (1969). A permissible prior restraint must include "adequate procedural safeguards to avoid unconstitutional censorship." Frandsen, 212 F.3d at 1239 n.7. Facially valid prior restraints require: (1) the burden of going to court to suppress speech and of proof once in court rests upon the government; (2) any restraint prior to a judicial determination may only be for a specified brief period to preserve the

34

status quo; and (3) an avenue for prompt judicial review of the censor's decision must be available. Id. at 1238; Freedman v. Maryland, 380 U.S. 51, 58–59 (1965).

Section 337.406(1) articulates a prior restraint on speech because anyone who wishes to solicit charitable donations on state rights of way must first obtain a permit:

> Local government entities may issue permits of limited duration for the temporary use of the right-of-way of a state transportation facility for any of these prohibited uses [including solicitation for charitable purposes] if it is determined that the use will not interfere with the safe and efficient movement of traffic and the use will cause no danger to the public. The permitting authority granted in this subsection shall be exercised by the municipality within incorporated municipalities and by the county outside an incorporated municipality.

§ 337.406(1).

The permitting scheme described in § 337.406(1) does not include adequate procedural safeguards. It includes no explicit standards for issuance other than general safety, no time limits, and no review process for denials. Local governments seem to have unfettered discretion not only regarding who receives a permit, but also regarding whether and how to institute a permitting procedure in the first place. This is brought into sharp focus here because neither the State, St. Johns County, nor Sheriff Shoar have ever created a process by which a person can obtain a permit under § 337.406(1), and the

statute does not require them to do so. Thus, there is literally no way for Mr. Vigue to comply with the permitting requirement, even if he wanted to.

Courts have routinely struck down permitting schemes with similar deficiencies. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225–26 (1990) (stating that "cases addressing prior restraints have identified two evils that will not be tolerated," including unbridled government discretion and lack of time constraints); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1272 (11th Cir. 2005) (finding a sign code's permitting requirement to be "precisely the type of prior restraint on speech that the First Amendment will not bear" when it contained no time limit for decisions and vested officials with unbridled discretion); Frandsen, 212 F.3d at 1240 (finding that a permit requirement to hold meetings in public parks was an unconstitutional prior restraint because it did not provide time constraints); Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1363 (11th Cir. 1999) (finding that a zoning board licensing requirement for sexually oriented businesses was an unconstitutional prior restraint because it vested too much discretion in the zoning board). The permitting scheme in § 337.406(1) for charitable solicitation is an unconstitutional prior restraint on speech.[15]

---

[15] The permitting scheme in § 337.406 explicitly lists "the solicitation for charitable purposes" as a prohibited use of the roadway for which one must obtain a permit. For that reason, the permitting scheme appears to be content-based. See Reed, 576 U.S. at 163 ("Government regulation of speech is content

ii.     <u>The prohibition on charitable solicitation in Section 337.406(1) is unconstitutional.</u>

Beyond the unconstitutional permitting scheme, § 337.406(1) is written in a somewhat confusing manner, so it is worth reiterating its provisions. First, § 337.406(1) bans certain conduct on rights-of-way of state transportation facilities and their appendages:

> Except when leased as provided in s. <u>337.25</u>(5) or otherwise authorized by the rules of the department, it is unlawful to make any use of the right-of-way of any state transportation facility, including appendages thereto, outside of an incorporated municipality in any manner that interferes with the safe and efficient movement of people and property from place to place on the transportation facility.

§ 337.406(1). Next, it specifies the prohibition's purpose:

> Failure to prohibit the use of right-of-way in this manner will endanger the health, safety, and general welfare of the public by causing distractions to motorists, unsafe pedestrian movement within travel lanes, sudden stoppage or slowdown of traffic, rapid lane changing and other dangerous traffic movement, increased vehicular accidents, and motorist injuries and fatalities.

---

based if a law applies to particular speech because of the topic discussed or the idea of message expressed.") However, even if the permitting scheme were content-neutral, it could not pass constitutional muster. Though the Supreme Court has "never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in <u>Freedman</u>," still, "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." <u>Thomas v. Chicago Park Dist.</u>, 534 U.S. 316, 322–23 (2002). Thus, even a content-neutral permitting scheme must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." <u>Id.</u> The permitting scheme in § 337.406 does not contain such standards.

Id. Then, it gives examples of "prohibited uses:"

> Such prohibited uses include, but are not limited to, the free distribution or sale, or display or solicitation for free distribution or sale, of any merchandise, goods, property or services; the solicitation for charitable purposes; the servicing or repairing of any vehicle, except the rendering of emergency service; the storage of vehicles being serviced or repaired on abutting property or elsewhere; and the display of advertising of any sort, except that any portion of a state transportation facility may be used for an art festival, parade, fair, or other special event if permitted by the appropriate local governmental entity.

Id. (emphasis added).

Finally, the law imposes the previously discussed permitting scheme. Id.

Section 337.406(1) appears to provide a content-neutral, outright prohibition on activity that interferes with the flow of people and property, followed by content-based list of prohibited uses and an impermissible permit scheme. The statute's imprecision led Judge Antoon to comment on its "opaque and undecipherable permit provisions,"[16] led the Cox court to find an earlier

---

[16] In Bischoff, Judge Antoon pointed out ambiguity in the type of conduct prohibited without a permit and troublesome cross-referencing between § 337.406 and § 316.2045(2):

> But § 337.406(1) is unclear as to whether the term "these prohibited uses" refers only to uses "for an art festival, parade, fair or other special event." May municipalities also permit other uses prohibited by § 337.406(1), such as charitable solicitation that interferes with traffic movement? The answer may be important not only to someone seeking a permit for soliciting in a municipality, but also to someone who simply wants to avoid using a state road for a purpose specified in § 337.406—i.e., a person who

version of the statute unconstitutional, 702 F. Supp. at 900-03, and led the

<u>Chase</u> court to find the current version of the statute unconstitutional, 2006 WL

3826983, at \*1–2. The Court concurs with those courts, and additionally, finds

that the current version of § 337.406(1) is overbroad as it pertains to charitable

solicitation.

Here, without the impermissible and unavailable permitting scheme, the

remainder of § 337.406(1) prohibits all "solicitation for charitable purposes" on

rights of way of state transportation facilities and appendages thereto. An

outright prohibition on charitable solicitation is overbroad. Even if the statute

is considered content-neutral, it must survive intermediate scrutiny—that is,

the regulation must be narrowly tailored to serve a significant government

interest and must leave open alternative channels of communication. <u>See, e.g.</u>,

<u>McCullen v. Coakley</u>, 573 U.S. 464, 477 (2014); <u>see also</u> <u>United States v. Grace</u>,

461 U.S. 171, 177 (1983). It cannot "burden substantially more speech than is

necessary to further the government's legitimate interests." <u>McCullen</u>, 573 U.S.

at 486 (internal quotation omitted). A narrowly tailored statute "targets and

---

has no permit but wants to avoid violating § 316.2045(2). The
statute provides no answer. This level of detail in the analysis is
necessary because the Florida Legislature chose to make the
criminality of a person's conduct under § 316.2045(2) dependent on
the "purposes" set forth in § 337.406.

242 F. Supp. 2d at 1254–55.

eliminates no more than the exact source of the 'evil' it seeks to remedy." Cox, 702 F. Supp. at 900 (quoting Frisby v. Schultz, 487 U.S. 474, 475 (1988)).

The Cox court found that § 337.406 was not narrowly tailored because the statute banned "any commercial activity by anyone, at any time, at any place on a state-maintained road." 702 F. Supp. at 901. Thus, the court concluded, it was not carefully drawn to meet the City's interests, made no attempt to restrict activity to certain times, failed to distinguish between children and adults who may be more safety-conscious, and failed to take into account that traffic hazards may vary. Id. Today, the same reasoning applies to the statute's ban on all charitable solicitation. The statute prohibits more than the exact source of evil that it seeks to remedy—solicitation that poses a true traffic safety threat.

In First Amendment cases, there exists a serious concern that overbroad laws may lead to a chilling effect on protected expression. See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 582 (1998); Dombrowski v. Pfister, 380 U.S. 479, 487 (1965). Thus, courts invalidate statutes when "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." Gooding v. Wilson, 405 U.S. 518, 521 (1972). When a statute implicates First Amendment rights, it must be written

clearly and narrowly drawn. Section 337.406(1)'s provisions concerning charitable solicitation are not and are therefore unconstitutional.

### E.    First Amendment Freedom and Traffic Safety

The Supreme Court's articulation of why public streets, sidewalks, and parks are critical to First Amendment freedom resonates strongly in this case:

> It is no accident that public streets and sidewalks have developed as venues for the exchange of ideas. Even today, they remain one of the few places where a speaker can be confident that he is not simply preaching to the choir. With respect to other means of communication, an individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site. Not so on public streets and sidewalks. There, a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," this aspect of traditional public fora is a virtue, not a vice.

McCullen, 573 U.S. at 476 (internal citation omitted).

Mr. Vigue's right to free speech is vital. But to be sure, the Court finding § 316.2045 and portions of § 337.406(1) unconstitutional does not give Mr. Vigue and others carte blanche to solicit charity on roadways however they wish. "It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous." Cox, 702 F. Supp. at 900 (quoting Int'l Soc. For Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge, 668 F. Supp. 527, 530 (M.D. La. 1987), aff'd, 876 F.2d 494 (5th Cir. 1989)). Thus, the Legislature may legislate on these topics so long as it strikes

41

the careful balance between upholding First Amendment rights and ensuring traffic safety. Unfortunately, neither § 316.2045 nor § 337.406(1) meet this test.

It is essential that law enforcement is not left without recourse for traffic safety problems posed by people blocking traffic in streets, asking for money or otherwise. In Booher, Judge Hodges stated that "concerns about traffic safety during the pendency of the injunction [were] adequately addressed by [other] existing laws." 2007 WL 9684182, at *4. Similarly, Mr. Vigue asserts that "there are other laws in place that better address pedestrian and vehicular safety," such as § 316.130. (Doc. 59 at 16). Florida's legitimate interest in road safety "can be better served by measures less intrusive than a direct prohibition on solicitation." Schaumburg, 444 U.S. at 637.

## F.    Severability

Having found portions of both statutes to be unconstitutional, the Court now turns to the question of whether those portions are severable from the rest of the statute. Severability is a question of state law. Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1317 (11th Cir. 2017). When, as here, there is no severability clause, the "key determination is whether the overall legislative intent is still accomplished without the invalid provisions." State v. Catalano, 104 So. 2d 1069, 1080–81 (Fla. 2012) (refusing to sever prior version of § 316.2045(1)(a) when severance would expand statute's reach beyond what the legislature contemplated); Lawnwood Med. Ctr., Inc. v. Seeger, 990 So. 2d 503,

42

518 (Fla. 2008) (refusing to sever hospital governance law when act would not be complete with invalid portions severed to accomplish what the legislature intended).[17]

In § 316.2045, the unconstitutional provision is the crux of the statute. If §§ 316.2045(1)–(4) were to be severed from the small portion of the statute that remains, § 316.2045(5), the law would fail to serve the legislative intent of regulating traffic safety through prohibiting solicitation and establishing a permit scheme. Thus, the Court cannot sever the unconstitutional provisions of § 316.2045 and salvage the remaining section.

---

[17] The Florida Supreme Court in Catalano laid out the purpose of the severability doctrine and the test for severability in Florida:

> Severability is a judicially created doctrine which recognizes a court's obligation to uphold the constitutionality of legislative enactments where it is possible to remove the unconstitutional portions. It is derived from the respect of the judiciary for the separation of powers, and is designed to show great deference to the legislative prerogative to enact laws. The portion of a statute that is declared unconstitutional will be severed if: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other, and (4) an act complete in itself remains after the invalid provisions are stricken.

Catalano, 104 So. 3d at 1080 (internal citations and quotations omitted).

On the other hand, the Court has found only the portions of Section 337.406(1) that prohibit charitable solicitation to be unconstitutional. The rest of § 337.406(1) is not at issue here; Mr. Vigue has mounted a facial challenge only to the statute's prohibition on charitable solicitation. The Court does not reach the portions of §§ 337.406(1) that do not pertain to charitable solicitation, or §§ 337.406(2)–(5). Thus, the portions of § 337.406(1) pertaining to charitable solicitation are severed from the statute. The portions of § 337.406(1) unrelated to charitable solicitation and the entirety of §§ 337.406(2)–(5) remain unaffected.

### G.    Permanent Injunction

For a permanent injunction to be issued, Mr. Vigue must: (1) show actual success on the merits of claims asserted in the complaint; (2) establish that irreparable harm will result from failure to provide injunctive relief; (3) establish that the balance of equities tips in his favor; and (4) demonstrate that an injunction is in the public interest. KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006). Permanent injunction requirements are the same as those for a preliminary injunction, except that Mr. Vigue must show actual success on the merits as opposed to likelihood of success on the merits of his claims. Id.

Mr. Vigue has succeeded in his claims that §§ 316.2045 and portions of 337.406(1) are unconstitutional. "The loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Here, Mr. Vigue has suffered and will continue to suffer denial of his First Amendment right to expression in the form of charitable solicitation. Arrest and incarceration pursuant to §§ 316.2045(1) and 316.2045(2), as well as warnings and threats of arrest pursuant to § 337.406, prohibit Mr. Vigue from engaging in protected speech. With these statutes in effect and no available permitting scheme with procedural safeguards in place, Sheriff Shoar retains unbridled discretion to enforce the statutes that bar Mr. Vigue's protected speech activity. "Because chilled speech cannot be compensated by monetary damages, an ongoing violation of the First Amendment constitutes irreparable injury." Univ. Books & Videos, Inc. v. Metro. Dade Cty., 33 F. Supp. 2d 1264, 1373 (S.D. Fla. 1999).

Injury to Mr. Vigue also outweighs any harm the injunction might cause Sheriff Shoar. Even without §§ 316.2045 and 337.406, Sheriff Shoar is still free to enforce all other state and local laws to maintain safe roadways throughout the county. Sheriff Shoar has already altered enforcement of these statutes through Policy 41.39, and makes no claim of increased difficulty maintaining safe roadways as a result of the new policy. Courts regularly find that injury to plaintiffs outweighs harm to defendants in First Amendment cases. See Baumann v. City of Cumming, No. 2:07-CV-0095-WCO, 2007 WL 9710767, at *7 (N.D. Ga. Nov. 2, 2007) ("[T]he temporary infringement of First Amendment

rights constitutes a serious and substantial injury, and the city has no legitimate interest in enforcing an unconstitutional ordinance.").

Finally, "[t]he public interest is served by the maintenance of First Amendment freedoms and could not possibly be served by the enforcement of an unconstitutional ordinance." Howard v. City of Jacksonville, 109 F. Supp. 2d 1360, 1365 (M.D. Fla. 2000). While citizens certainly have an interest in remaining safe, and Sheriff Shoar has an interest in ensuring traffic safety, the "interest[] in remaining safe while walking or driving [is] served by other statutes and codes available to law enforcement officers." Chase, 2006 WL 2620260, at *3.

### H.   Damages

Mr. Vigue claims that Sheriff Shoar is liable for compensatory damages for violation of Mr. Vigue's constitutional rights, and that he should proceed to trial on the issue of damages. (Doc. 59 at 24). Mr. Vigue relies primarily on Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299 (1986) to argue that compensatory damages should be available.

For actions under § 1983, "the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question." Carey v. Piphus, 435 U.S. 247, 259 (1978). In reviewing the law, the Court understands that nominal damages are available in First Amendment cases. Pelphrey v. Cobb Cty., 547

F.3d 1263, 1282 (11th Cir. 2008) ("This Court has found that 'nominal damages are similarly appropriate in the context of a First Amendment violation.'"); Familias Unidas v. Briscoe, 619 F.2d 391, 402 (5th Cir. 1980) (holding that nominal damages are available for violations of the First Amendment); see also Gonzalez v. Sch. Bd. of Okeechobee Cty., 250 F.R.D. 565, 570 (S.D. Fla. 2008) (finding that nominal damages were available in a § 1983 action for violations of the First Amendment).[18] But the Court is uncertain regarding whether there also exists a legal and factual basis for compensatory damages in this case. Compare Carey, 435 U.S. at 264 (stating compensatory damages under § 1983 are available only when plaintiff shows actual injury); with Stachura, 477 U.S. at 310-11 ("When a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may possibly be appropriate."); see also King v. Zamiara, 788 F.3d 207, 213 (6th Cir. 2015) (surveying cases where compensatory damages were permitted for deprivation of constitutional rights and concluding that compensatory damages were appropriate "for specific, actual injuries [plaintiff] suffered that cannot be easily quantified"); Celli v. City of St. Augustine, 214 F. Supp. 2d 1255, 1262 (M.D. Fla. 2000) (allowing jury to place monetary value on intangible free

---

[18] Fifth Circuit precedent prior to October 1, 1981 is binding on the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

speech rights to determine damages in § 1983 action). If Mr. Vigue wishes to pursue more than nominal damages, the Court directs him to submit a proffer of the legal and factual basis for compensatory damages.

### III.   CONCLUSION

In ruling in favor of Mr. Vigue on the constitutionality of §§ 337.2045 and 337.406, the Court is following precedent and upholding important First Amendment and Equal Protection principles. Of course, as suggested by Florida's Attorney General in 2007, the Legislature is free to rewrite these statutes to try to alleviate the constitutional infirmities. For now, Sheriff Shoar has demonstrated through his Policy Directive 41.39 that he can abide by the Court's decision on an ongoing basis such that Mr. Vigue will be free to exercise his constitutional right to solicit. However, the Court also addresses Mr. Vigue: this decision is not a license to trespass on private property, interfere with traffic, station himself where he obstructs traffic or creates a safety hazard to himself or others. If he does so, there are other laws which can be brought to bear. The Court is confident that both Sheriff Shoar and his deputies and Mr. Vigue will exercise common sense and good judgment.

Accordingly, it is hereby

**ORDERED:**

1. Plaintiff Peter Vigue's Motion for Partial Summary Judgment (Doc. 59) is **GRANTED** for the reasons stated herein.

2. Defendant David B. Shoar's Motion for Summary Judgment (Doc. 60) is **DENIED** for the reasons stated herein.

3. Florida Statute § 316.2045 is found to be facially unconstitutional under the First and Fourteenth Amendments. Declaratory Judgment to that effect will be entered at the conclusion of the case.

4. The portions of Florida Statute § 337.406(1) pertaining to charitable solicitation are found to be facially unconstitutional under the First and Fourteenth Amendments. Declaratory Judgment to that effect will be entered at the conclusion of the case.

5. Defendant David B. Shoar, in his official capacity as Sheriff of St. Johns County, is hereby permanently **ENJOINED** from enforcing Florida Statutes §§ 316.2045 and 337.406(1), the latter insofar as it pertains to charitable solicitation. A final permanent injunction will be entered at the conclusion of the case.

6. If he wishes to pursue compensatory damages, Mr. Vigue is directed to submit a proffer of the legal and factual basis for a claim for damages no later than **November 19, 2020**, and Sheriff Shoar is directed to respond no later than **December 21, 2020**. The Court will then determine how to proceed.

7. Any claim for attorneys fees and costs will await the conclusion of the case.

**DONE AND ORDERED** in Jacksonville, Florida the 12th day of October, 2020.


TIMOTHY J. CORRIGAN
United States District Judge


tnm
Copies:

Counsel of record